IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 1, 2017

## IN RE STEEVIE A.

**Appeal from the Chancery Court for Henderson County**
**No. 26646    James F. Butler, Chancellor**

_____

**No. W2016-02577-COA-R3-PT**

_____

The trial court terminated Father's parental rights on grounds of: (1) abandonment by willful failure to visit; (2) abandonment by willful failure to support; (3) abandonment by failure to establish a suitable home; and (4) persistence of conditions. We reverse the grounds of abandonment by failure to establish a suitable home and persistence of conditions. In all other respects, we affirm the judgment of the trial court, including the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and RICHARD H. DINKINS, J., joined.

William Milam, Jackson, Tennessee, for the appellant, Steven A.

Sara E. Barnett and Charles H. Barnett, III, Jackson, Tennessee, for the appellees, Michael S., Latisha S., Derek Y., and Tiffany Y.

John Andrew Anderson, Jackson, Tennessee, Guardian Ad Litem.

MEMORANDUM OPINION[1]

---

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum

## Background

The child at issue was born in March 2013 to parents Casondra A. ("Mother") and Steven A. ("Father").[2] On September 10, 2014, the Tennessee Department of Children's Services ("DCS") received a referral alleging that the child at issue was in danger and drug exposed. The report alleged that Father had barricaded himself in his home and would not allow Mother custody of the child. When DCS and law enforcement arrived at the home, Father cooperated but admitted that he had used methamphetamines in the last week. Father tested positive for marijuana only. Father informed DCS workers that Mother had also recently abused drugs. An investigation of the home revealed that Father had no proper crib for the child. As a result, DCS removed the child from Father's home and placed her with the child's maternal aunt and uncle, Petitioners/Appellees Michael ("Maternal Uncle") and Latisha S. ("Maternal Aunt," and together with Maternal Uncle, "Legal Guardians").[3] The next day, the Henderson County Juvenile Court ("the juvenile court") entered an order finding that there was probable cause to believe that the child was dependent and neglected and placing custody of the child with DCS. On September 17, 2014, the juvenile court entered an order transferring custody of the child from DCS to Legal Guardians. Although DCS did not appear to retain custody of the child, it remained involved in this case until April 2015.

On the same day, DCS filed a petition to adjudicate the child dependent and neglected. On December 9, 2014, the juvenile court entered an order finding the child dependent and neglected upon Mother's and Father's stipulations. In this order, both parties were granted supervised visitation. There is no dispute that Father exercised visitation until December 2014, when he informed the juvenile court that his relapsed alcoholism required that he attend a rehabilitation program. After December 2014, there is no dispute that Father did not exercise any visitation with the child. Thereafter, on May 5, 2015, the juvenile court entered a dispositional order allowing the child to remain in Legal Guardians' custody.[4] The order specifically stated that all prior orders regarding visitation remained in effect and that parents could petition "for visitation/increase in visitation when they have complied with all prior court orders and can prove to the [c]ourt that they can provide a safe and suitable home for the children, free from drug use." Finally, the order relieved DCS of any involvement in the case.

---

opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2] In termination of parental rights cases, it is this Court's policy to remove the full names of children and other parties to protect their identities.

[3] Maternal Aunt is Mother's sister.

[4] Father was not present for this hearing, as he was in a rehabilitation program.

At some point in 2015, Legal Guardians came to believe that it was in the child's best interest to reside with family friends, Appellee/Petitioners Tiffany and Derek Y. (together "Prospective Adoptive Parents," and with Legal Guardians, "Petitioners"). According to the testimony, Prospective Adoptive Parents hoped to adopt a child and the two families determined that the child was a good fit with Prospective Adoptive Parents. In making this decision, Maternal Aunt testified that the two families spent considerable amounts of time together, leading to the child spending weekends with Prospective Adoptive Parents, and finally transitioning to living with Prospective Adoptive Parents full-time in approximately October 2015. At this time, Legal Guardians executed a power of attorney for a minor child in favor of Prospective Adoptive Parents. Prospective Adoptive Parents retained physical custody of the child at the time of trial, and there was no dispute that Prospective Adoptive Parents, rather than Legal Guardians, wished to adopt the child.

On June 17, 2015, Legal Guardians filed a petition to terminate the parental rights of both Mother and Father in the Henderson County Chancery Court ("the trial court").[5] On August 3, 2015, Legal Guardians filed a motion to suspend visitation with Mother and Father. With regard to Father, the motion alleged that Father had called Maternal Aunt several times while she was at work "wanting to speak with the [c]hild." Legal Guardians asserted that these calls were harassing and that contact with Father would harm the child due to Father's long absence from her life. No order is contained in the record adjudicating Legal Guardians' motion. Instead, on October 16, 2015, the termination petition was voluntarily dismissed without prejudice as to Father. The same day, however, a separate petition to terminate Father's parental rights was filed under a different docket number. The petition alleged grounds of: (1) abandonment by willful failure to visit; (2) abandonment by willful failure to support; (3) abandonment by failure to establish a suitable home; and (4) persistent conditions. Curiously, Legal Guardians later sought to consolidate the separate cases, which request was granted by the trial court by the consent of the parties on January 21, 2016. On June 20, 2016, the trial court granted Legal Guardians permission to file an amended petition to add as co-petitioners Prospective Adoptive Parents, who hoped to adopt the child. The amended petition was filed the same day.

A trial was held over several days in June and July of 2016. Legal Guardians confirmed that the child was placed in their care in September 2014. At the time, Maternal Aunt testified that Father informed her that he would not stop drinking despite the removal of the child. After a period of time in Legal Guardians' home, they determined that the child should live with Prospective Adoptive Parents, who wanted to adopt the child. Legal Guardians and Prospective Adoptive Parents therefore spent time together to create a gradual transition for the child from one home to the other. Although the child lived with Prospective Adoptive Parents full-time by the time of trial, both

_____

[5] Only Father's parental rights are at issue in this appeal.

families testified that they spend considerable amounts of time together. Moreover, both families testified that the child has made a marked improvement since being removed from parents' custody. For example, while the child was initially afraid of men, both Prospective Adoptive Parents and Maternal Uncle testified that she no longer exhibits fear around them. Prospective Adoptive Parents also testified that the child refers to them as her parents and that she does not have any relationship with Father. As such, Prospective Adoptive Parents testified that removing the child from their home and placing her with a parent she does not know would be "traumatic" for the child.

Maternal Aunt confirmed through her testimony that Father's visitation generally went well for a time but was terminated in December 2014, after Father appeared in court and informed the court that his drinking had deteriorated so that "he was throwing up into a bottle and re-drinking it." At that point, Maternal Aunt testified that the juvenile court informed Father that visitation would be suspended and that Father could petition the court to renew visitation once he received help for his alcoholism.

Maternal Aunt next testified as to the calls by Father that prompted Legal Guardians to file the motion to terminate all contact between Father and the child. According to Maternal Aunt, Father called her several times around June of 2015, asking how the child was doing. Although Maternal Aunt testified that Father asked what he could do for the child, she testified that he never specifically offered financial support for the child, nor did he ask to visit with the child. In response, Maternal Aunt testified that she informed Father than he should speak with his attorney. There was no dispute that Legal Guardians received no financial support from Father in the months prior to the filing of the October 16, 2015 termination petition.

Two DCS workers testified about their involvement with the family. The DCS workers generally testified that Father's initial home did not have a proper crib for the child and that Father subsequently moved into a trailer that was also unsuitable. During the time that DCS was involved in the case, the DCS workers testified that they met several times with parents and developed a plan that required parents to obtain proper housing and employment. The DCS workers also provided drug testing for the parents in order to permit visitation and recommended a drug rehabilitation facility to Father. It also appears that DCS worked to allow Father to obtain supervised visitation.

Father generally admitted that the child's removal was a result of his and Mother's alcohol and drug problems. Father also admitted that his drinking became so bad that the juvenile court suspended his visitation in December 2014 and required that Father establish that he was sober to renew visitation. Father did not deny that he had been charged with upwards of five crimes since the child's birth, ranging from violating community corrections to theft.[6] In addition, Father was also arrested three times for

---

[6] The record shows that Father had been charged with several more crimes prior to the child's birth.

domestic violence toward Mother. For example, in January 2015, Father was arrested and pleaded guilty to domestic violence against Mother, in an altercation that left Mother severely injured. Father admitted that the child had been present when he had been violent toward Mother in the past.

Father testified, however, that his issues with violence all occurred when he was under the influence of drugs or alcohol, and that he had not used drugs or alcohol since January 2015. Father also testified that he had completed a 21-day program of rehabilitation following his release from jail on the domestic violence charge and currently attended Alcoholics Anonymous meetings regularly. Father submitted documentary proof of his completion of rehabilitation and parenting classes, as well as records from his probation officer showing that Father passed drug and alcohol screenings in February 2016, April 2016, and May 2016. Father testified that he is no longer on probation, that he lives in housing that is appropriate for the child, and that he has an appropriate plan for the care of the child should she be returned to his care. Father also noted that although Mother lived in the home with him for a time, he was forced to evict Mother because she did not remain sober. Father testified that he intends to initiate divorce proceedings once the termination proceeding was completed. Father submitted the testimony of several individuals with knowledge of his living situation and sobriety to support his testimony.

Father further testified that he obtained steady employment in early June 2015, making him capable of paying child support for the child as of that time. According to Father, in April or May 2015 and again in June 2015, he called Maternal Aunt to inquire about visitation and support for the child.[7] Father testified, however, that Maternal Aunt rebuffed his efforts, even threatening to file harassment charges against Father. Father also testified that he could not send funds to Legal Guardians because he did not have their address. According to Father, a few weeks after his June 2015 call to Maternal Aunt, he received notice that a child support proceeding had been initiated and that he was to appear in juvenile court in December 2015. As such, Father testified his counsel directed him to take no action until that hearing date, in which he was ordered to pay child support. There is no dispute that Father has paid regular child support since December 2015. Father admitted, however, that he did not initiate the child support proceeding, but that it was initiated either by Legal Guardians or the State.

The trial court took the matter under advisement and issued a final judgment on October 27, 2016. Therein, the trial court found that Petitioners had shown clear and

---

[7] Father also testified that he saw Maternal Uncle while visiting Mother in jail on a few occasions. Father testified that he always inquired about the child on these occasions. Maternal Uncle works as a law enforcement officer. Father also testified somewhat confusingly that he had contacted Legal Guardians' initial attorney regarding visitation and/or support. Father testified that the attorney informed Father that she could not talk to Father, but also spoke to Father for two hours.

convincing evidence of all grounds for termination and that termination was in the child's best interest. Father now appeals.[8]

## Issues Presented

Father raises two issues in this case, which are restated from his brief:

1. Whether the trial court erred in finding that Father abandoned his child by willfully failing to visit or support the child.
2. Whether the trial court erred in finding termination of Father's parental rights in the child's best interest.

## Standard of Review

As explained by the Tennessee Supreme Court:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-

---

[8] While this appeal was pending, it was determined that Father did not personally sign the notice of appeal. In a prior Court of Appeals case, this failure was determined to be fatal to this Court's jurisdiction. In *In re Bentley D.*, No. E2016-02299-SC-RDO-PT (Tenn. Nov. 22, 2017), however, the Tennessee Supreme Court held that the ambiguous language of Tennessee Code Annotated section 36-1-124(d) should not be read to require the personal signature of the litigant-appellant. As such, the signature of Father's attorney on his notice of appeal is sufficient to confer subject matter jurisdiction on this Court.

R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

As opined by the Tennessee Supreme Court:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting *In re Adoption of A.M.H.*, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 2016 WL 819593, at *12.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

**Discussion**

**Grounds for Termination**

7

Here, the trial court found four grounds for terminating Father's parental rights: (1) abandonment by willful failure to visit pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(a)(i); (2) abandonment by willful failure to support under the same code sections; (3) abandonment by failure to establish a suitable home pursuant to Tennessee Code Annotated section 36-1-113(g)(1) and 36-1-102(1)(a)(ii); and (4) persistence of conditions pursuant to Tennessee Code Annotated section 36-1-113(g)(3). Although Father confines both the statement of the issues and arguments in his brief to only the grounds of willful failure to visit and support, we will consider each ground. *See In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016) (ruling that intermediate appellate courts must consider all grounds found by the trial court "regardless of whether the parent challenges these findings on appeal").

### Abandonment by Willful Failure to Visit and Support

Of the four grounds at issue in this case, three involve abandonment pursuant to Tennessee Code Annotated section 36-1-113(g)(1), which provides that abandonment "by the parent or guardian, as defined in § 36-1-102" provides one ground for termination of parental rights. In turn, section 36-1-102 provides that abandonment may be shown by, *inter alia*, proof that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(a)(i). Thus, a parent's willful failure to visit or support a child in the four months preceding the filing of the termination petition will serve as separate bases for termination. In this case, Petitioners alleged that Father had both willfully failed to visit and willfully failed to support the child in the four months prior to the October 16, 2015 filing of the termination petition against Father.[9]

In this case, there can be no dispute that Father did not visit nor provide any financial support from June 16, 2015, to October 15, 2015, the relevant four-month period. With regard to support, there is also no dispute that Father had the ability to pay support during this time. Father argues, however, that his failure to visit or support was not willful because he was thwarted in his efforts by Legal Guardians. In order for a court to terminate a parent's parental rights on the ground of abandonment, that abandonment

---

[9] Although a petition was initially filed against Father in June 2015, it was subsequently non-suited. Thus, there is no dispute that the October 2015 petition is the operative petition in this case.

must be willful. In ***In re Audrey S.***, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing . . . .
>
> *   *   *
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. ***In re M.J.B.***, 140 S.W.3d at 654; *see also* ***Shorter v. Reeves***, 72 Ark. App. 71, 32 S.W.3d 758, 760 (2000); ***In re B.S.R.***, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); ***In re Estate of Teaschenko***, 393 Pa. Super. 355, 574 A.2d 649, 652 (1990); ***In re Adoption of C.C.T.***, 640 P.2d 73, 76 (Wyo. 1982). . . .
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

***In re Audrey S.***, 182 S.W.3d at 863–64 (internal citations and footnotes omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." ***In re Adoption of Angela E.***, 402 S.W.3d at 640 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 810). As previously discussed, this Court reviews questions of law *de novo* with no presumption of correctness. ***Id.***

## I.

We begin with Father's failure to visit the child. Here, although Father admits that he did not visit the child in the relevant four-month period, Father asserts that Legal

Guardians actively thwarted his efforts to visit the child when he inquired about visitation in May and June 2015. With regard to this issue, this Court has explained:

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. . . . Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child . . . . The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.

*In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (footnotes and citations omitted).

> Here, the trial court found as follows:
>
> Father has not sought to exercise his visitations. He testified he sought to contact [Legal Guardians] in June 2015, but got a "negative response". He contacted his legal counsel, but took no action to reinstitute visitations with the child. Father stipulated that he has not seen the child since January, 2015, or thereabouts. He testified the Juvenile Court Judge allowed him visits in December, 2014, if he was sober, but that he continued to drink alcohol. He testified he inquired of the Juvenile Court Judge about visitations in December, 2015 at his child support hearing, but the Termination Petition had been filed against him some three months earlier.

Our de novo review of the record supports the trial court's determination with regard to this ground.

As an initial matter, we must first discuss the state of the record concerning the limitations placed on Father's visitation by the juvenile court. From our review of the record, no order was entered following the December 2014 hearing in which there is no dispute that the trial court suspended Father's visitation pending an effort by him to obtain sobriety. Generally, a court speaks through its written orders and oral pronouncements are of no effect. *See In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001) (holding that the court speaks through its written orders); *Sparkle Laundry & Cleaners, Inc. v. Kelton*, 595 S.W.2d 88, 93 (Tenn. Ct. App. 1979) ("A Court speaks only through its written judgments, duly entered upon its minutes. Therefore, no oral pronouncement is of any effect unless and until made a part of a written judgment duly

10

entered."). In this case, however, Father admitted at trial that the juvenile judge suspended visitation with the child and informed him that he would receive visitation with the child once more when Father had made progress in treating his alcoholism. In addition, the juvenile court's order following the dispositional hearing, entered in May 2015, confirms that any previously ordered limitations on visitation remained in effect and that both parents were required to petition the juvenile court to resume visitation once they could establish they were "free from drug use." Thus, we conclude that there is a sufficient written order in the record to confirm that Father's visitation was suspended until he could petition the court to show an improvement in drug and alcohol problems.

This Court has previously held that where a parent is ordered to fulfill certain conditions prior to the resumption of visitation, the failure to fulfill the conditions results in the parent's failure to visit being willful. *See, e.g., In re Jaylah W.*, 486 S.W.3d 537, 553 (Tenn. Ct. App. 2015), *perm. app. denied* (Tenn. Feb. 1, 2016) (holding that mother's failure to provide proof to the court that she had remedied the conditions that led to the suspension of visitation resulted in a finding that her failure to visit was willful, even though visitation had been terminated by the court); *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014) ("This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit."). There is no dispute, however, that Father did not return to juvenile court prior to the filing of the termination petition in an effort to resume his visitation with the child, despite his testimony that he was no longer using drugs or alcohol as early as April 2015. Thus, Father chose not to pursue the avenue that the juvenile court outlined for him to resume visitation.

It appears undisputed, however, that Father did make some attempt to contact Maternal Aunt regarding the child in May and June 2015, the latter of which occurred within the relevant four-month period.[10] Father testified that during the June 2015 call, Maternal Aunt responded to his requests for visitation in the "negative" and threatened harassment charges against him. Indeed, following this contact, Legal Guardians filed a motion to suspend all contact with Father. Maternal Aunt testified, however, that Father did not ask for visitation during any of his phone calls, but that he vaguely asked what he could do to "help." According to Maternal Aunt, she informed Father that she could not give him advice and that he should instead consult his attorney. Even crediting Father's testimony that he expressly sought visitation in June 2015, we cannot conclude that Maternal Aunt acted inappropriately in her response to Father, given the juvenile court's undisputed ruling that visitation would only resume when ordered by the court.

---

[10] Father testified that he contacted Maternal Aunt in both April or May 2015 and June 2015. Both attempts were met with "negative" responses according to Father. Maternal Aunt confirmed that she spoke with Father in May and June 2015.

Furthermore, even if Maternal Aunt threatened Father with harassment charges, nothing prevented Father from seeking judicial intervention, as he had been previously ordered to do by the juvenile court.[11]

After the termination petition was filed in October 2015, Father still made no real effort to establish visitation with the child. First, Father testified that he asked for visitation during the December 2015 child support hearing, but that the juvenile judge informed Father that the case only concerned child support. Not only did this request take place well after the filing of the October 2015 termination petition, Father chose never to follow up by requesting visitation with the child by filing an appropriate petition in court. At the time, however, Father was represented by counsel and nothing in the record suggests that he was unable to pursue visitation in the appropriate court. Indeed, even after Legal Guardians filed their motion to suspend all contact with the child, Father filed no response in opposition and no motion of his own in the trial court to resume visitation. Given the totality of the circumstances, we conclude that the trial court did not err in determining that Father's failure to visit was willful.

## II.

We next consider whether Father's failure to support the child was willful. Parents are presumed to know they have a legal obligation to support their children. *See* Tenn. Code Ann. § 36-1-102(1)(H). Moreover, it is well-settled in Tennessee that:

> [B]iological parents must, as a general matter, support their children until they reach the age of majority. . . . The parent's obligation to support, as well as the child's right to support, exist regardless of whether a court order exists, and regardless of whether the parents were ever married."

*State ex rel. Hayes v. Carter*, No. W2005-02136-COA-R3-JV, 2006 WL 2002577, at *2 (Tenn. Ct. App. July 6, 2006) (citing Tenn. Code Ann. § 34-1-102(a); *Smith v. Gore*, 728 S.W.2d 738, 750 (Tenn. 1987)); *see also State Dep't of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997) ("We dare say that the support of one's children should not be conditioned upon whether one has been placed under a court order to do so."). The obligation to pay child support therefore exists even without a court order requiring the payment of child support. *State Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523–34 (Tenn. Ct. App. 2004). Although the record establishes that Father did begin to pay child support in December 2015 after being ordered to do so by the juvenile court, "[a]bandonment [by

---

[11] Moreover, even if we were to credit Father's testimony that he spoke with Legal Guardians' initial attorney for nearly two hours although she informed him that she could not discuss the case with him, we would likewise conclude that this conversation did not prevent Father from seeking judicial intervention regarding visitation.

failure to support] may not be repented of by resuming . . . support subsequent to the filing of any petition seeking to terminate parental . . . rights or seeking the adoption of a child[.]" Tenn. Code Ann. § 36-1-102(1)(F); *see also **In re Adoption of Angela E.***, 402 S.W.3d 636, 640 (Tenn. 2013) (quoting Tenn. Code Ann. § 36-1-102(1)(F)) ("A parent may not attempt to rectify abandonment by resuming payments of support subsequent to the filing of 'any petition' seeking to terminate parental rights or seeking to adopt a child.").

Here, the trial court specifically found that Father did not contact the State to pay child support but that the child support proceedings were initiated by the State. In addition, the trial court noted that while Father testified that he offered support to Maternal Aunt in June 2015, Maternal Aunt denied that he had made that offer. The trial court thereafter found that Father had willfully failed to pay child support, despite knowing of his obligation to do so. We cannot conclude the trial court erred in determining that Father's failure to pay support during the relevant period was willful.

First, there can be no dispute that Father paid no support for the child prior to the filing of the October 2015 termination petition despite his ability to do so. Although there is also no dispute that Father called Maternal Aunt around June 2015 to inquire about the child, Maternal Aunt denied that Father ever offered to send money to the child in any of her communications with Father. Given the conflicting testimony on this issue, the trial court was necessarily required to resolve this dispute by means of credibility. In determining that Father willfully failed to support the child, the trial court implicitly credited Maternal Aunt's testimony on this issue over Father's. As previously discussed, this Court gives the trial court's credibility findings considerable weight, and we will not overturn the trial court's credibility findings absent clear and convincing evidence to the contrary. *See **Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."). Nothing in Father's brief or the record on appeal provides clear and convincing evidence to support overturning the trial court's implicit credibility finding on this issue. Thus, we must likewise credit Maternal Aunt's testimony that Father offered no support during this phone call.

Indeed, even if we were to credit Father's testimony that Maternal Aunt rebuffed his offer of child support, there is no evidence that Maternal Aunt made any active effort to prevent Father from sending support to the child. Moreover, Father's testimony that he could not send money for the child rings hollow, as Father testified that he often saw Maternal Uncle in jail visiting Mother, and legal guardianship was placed with relatives, rather than strangers. Rather, it appears from the record that Father was content to wait until the State initiated proceedings against him before making any substantial effort toward paying child support.

13

The situation in this case is therefore analogous to *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788 (Tenn. Ct. App. June 17, 2015), *perm. app. denied* (Oct. 15, 2015). In *In re Makenzie*, the parents testified at trial that they had expended considerable effort and money to regain visitation with their child and cooperated with a petition filed by the State to establish child support. *Id.* at *11. Although the trial court found that the parents' failure to support was not willful under those circumstances, the Court of Appeals reversed, noting that the parents' efforts to establish visitation were not the same as efforts to establish support. Moreover, we held that the parents' "cooperation" in the child support proceeding was insufficient to show that they were seeking to establish support; instead, the record showed that after being served with the petition, parents took no action to actually establish support for the child. *Id.* at *19. Thus, the parents' failure to support was willful.

The same is true in this case. Although Father asserts that Maternal Aunt rebuffed his efforts to provide support, the trial court did not credit this testimony and nothing in the record shows that Maternal Aunt's alleged comments placed a significant restraint on Father's ability to pay support. *See In re Audrey*, 182 S.W.3d at 864. Moreover, even after being served with a subpoena to participate in the child support proceeding within the relevant period, Father took no action until he was forced to support the child through court order over a month after the filing of the termination petition. Under these circumstances, we must conclude that in the four months preceding the filing of the termination petition, Father had the ability to support the child, knew of his obligation to support the child, and made the voluntary decision not to support the child. The trial court's finding that this ground for termination had been established by clear and convincing evidence is therefore affirmed.

### Abandonment by Failure to Establish a Suitable Home

For the final ground involving abandonment, Petitioners also alleged abandonment for failure to establish a suitable home under Tennessee Code Annotated section 36-1-113(g)(1) and 36-1-102(1)(a)(ii). According to section 36-1-102, this type of abandonment may be established by proof that:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the

14

department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(a)(ii). A suitable home "requires more than a proper physical living location." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). "It requires that the home be free of drugs and domestic violence." *Id.*

As an initial matter, we have concerns regarding the applicability of this ground. The plain language of this ground for termination requires that the child be removed from the home of the parent and placed with a child care agency, such as DCS. *See* Tenn. Code Ann. § 36-1-102(1)(a)(ii). Although the child was removed from Father's home, initially placed with DCS, and later found to be dependent and neglected, shortly following the removal, legal and physical custody of the child was placed with Legal Guardians. Indeed, none of the subsequent orders involving custody indicate that DCS retained any custody rights over the child after custody was transferred to Legal Guardians. Still, DCS did remain involved in this case for approximately six months, until April 2015. On appeal, Father does not argue that the transfer of custody from DCS to Legal Guardians renders this ground inapplicable. Because we have determined that this ground has not been established by clear and convincing evidence, we need not determine this issue.

As noted by the above statutory language, the ground of failure to establish a suitable home is only met where evidence establishes that "for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child[.]" Although the Tennessee Supreme Court recognized that a showing a reasonable efforts by DCS is not prerequisite to all grounds for termination, the ground of failure to establish a suitable home expressly requires that DCS expend reasonable efforts. *See generally In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). A showing of reasonable efforts is therefore a prerequisite to termination under this ground. *In re Jasmine B.*, No. M2016-00464-COA-R3-PT, 2016 WL 5345339, at *4 (Tenn. Ct. App. Sept. 22, 2016). Thus, Petitioners were required to establish that DCS made reasonable efforts to help Father establish a suitable home in the four months following removal of the children. Although the trial court found that DCS expended reasonable efforts during this time, we respectfully cannot agree.

According to section 36-1-102(a)(1)(ii), "[t]he efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to

15

be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]" Therefore, DCS's "efforts do not need to be 'Herculean,' [but] DCS is required to use its 'superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.'" *In re Isobel V.O.*, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8 (Tenn. Ct. App. Nov. 8, 2012) (quoting *State, Dep't. of Children's Servs. v. Estes*, 284 S.W.3d 790, 800–01 (Tenn. Ct. App. 2008)). This Court has interpreted Tennessee Code Annotated section 36-1-102(1)(A)(ii) as directing that a reasonable efforts inquiry in this context be limited to an examination of the four-month period immediately following the child's removal from the home. *See, e.g., In re Riley C.*, No. M2015-00541-COA-R3-PT, 2016 WL 626058, at *8 (Tenn. Ct. App. Feb. 12, 2016); *In re M.A.P.*, No. E2014-02413-COA-R3-PT, 2016 WL 369399, at *5 (Tenn. Ct. App. Jan. 29, 2016); *In re Aaliyah E.*, No. E2015-00602-COA-R3-PT, 2016 WL 304627, at *6 (Tenn. Ct. App. Jan. 26, 2016). The relevant period in this case therefore spans from September 12, 2014 to January 11, 2015.

The testimony in the record regarding the efforts DCS expended to help Father establish a suitable home is sparse at best. The two DCS workers assigned to this case testified that they provided drug testing to Father to facilitate visitation, made a plan that directed Father to obtain housing and employment, made home visits to Father's home, and recommended a rehabilitation program for Father. There was no evidence, however, that DCS provided any resources to Father to help him accomplish these goals, such as offering assistance with obtaining housing or employment, during the relevant time. Although the record shows that Father did not have suitable housing as of November 2014, there is simply nothing in the record that establishes that DCS met its obligation to help him in this regard. In addition, the record shows that Father complied with drug and alcohol testing for a time and was able to visit with the child more or less consistently. In December 2014, however, it appears that Father recognized his alcohol issues and voluntarily agreed to suspend visitation so that he could work on his sobriety. Other than recommending a rehabilitation program, however, the record does not establish that DCS expended any effort to help Father meet this goal. Rather, the bulk of the evidence focuses on the requirements that DCS set for Father and Mother to meet, not the efforts expended by DCS to meet its own obligations under Tennessee law. Under these circumstances, we cannot conclude that, assuming this ground is applicable, Petitioners met their burden to show that DCS expended reasonable efforts to help Father establish a suitable home in the four months following the removal of the child. The trial court's finding with regard to this ground is therefore reversed.

**Persistent Conditions**

Finally, the termination petition also alleged persistent conditions under Tennessee Code Annotated section 36-1-113(g)(3). To establish this ground, Petitioners must show that:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

Here, there is no dispute that this ground is applicable because the child was removed from Father's home more than six months prior to the filing of the termination petition and adjudicated dependent and neglected by the juvenile court following the removal. As such, we must determine whether Petitioners met their burden to show clear and convincing evidence that conditions that place the child at risk of abuse or neglect persist.

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at \*6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.*

17

As an initial matter, we must first address the argument raised by Petitioners in their brief to this Court. Specifically, Petitioners assert that this Court must confine its review as to whether Father has remedied the conditions that led to the child's removal only to the six months following the removal. Neither the plain language of the statute nor caselaw concerning this ground support Petitioners' interpretation. First, we note that the express language of section 36-1-113(g)(3) provides that the ground is met if unsafe conditions "still persist," implying that the inquiry involves the circumstances as of the date of trial. Indeed, this Court has often considered circumstances up to the date of trial to determine whether this ground has been met. *See, e.g., In re Travis H.*, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at *12 (Tenn. Ct. App. May 5, 2017), *perm. app. denied*, (July 31, 2017) (considering the parent's circumstances at the time of trial); *In re Mya E.*, No. M2012-02323-COA-R3-PT, 2013 WL 2106839, at *8 (Tenn. Ct. App. May 13, 2013) (considering whether unsafe conditions had been remedied "by trial"); *In re E.M.S.*, No. M2009-00267-COA-R3-PT, 2009 WL 2707399, at *4 (Tenn. Ct. App. Aug. 27, 2009) (affirming the trial court's finding that the conditions had not been remedied by the trial date). While a parent's efforts may prove "[t]oo little, too late" depending on the circumstances, *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003), our review is simply not confined to the parent's progress in the six months following the removal of the child.

Considering the entire period following the removal of the child to the trial, we cannot conclude that Petitioners met their burden to show that the unsafe conditions still persist. Here, the child was removed due to an unsafe home and Father's drug and alcohol use. In addition, later events showed the home to be unsafe due to instances of domestic violence. While evidence showed that Father's home remained unsafe in November 2014, there is no evidence in the record to show that Father's home was unsafe in the summer of 2016 when the trial occurred. Instead, the only evidence in the record on this issue was Father's proof that his current apartment was safe for the child. Importantly, this is not a case where a parent refused to permit home visits that would have allowed DCS or legal guardians to determine the safety of a home. Indeed, nothing the record suggests that Father refused to allow a home visit of his current apartment; instead, the record indicates that once DCS was relieved by the juvenile court in April 2015, no home visits were ever attempted.

The record also does not establish that Father is continuing to use drugs and alcohol or that the danger of violence in the home is still present. Here, Father testified without dispute that he has been sober since January 2015 and submitted several drug screenings supporting his testimony. In addition, Father's testimony that his violence had been remedied by his sobriety was likewise undisputed. In contrast, Petitioners submitted no evidence that Father abused drugs or alcohol after December 2014 or that his issues with violence were still present at the time of trial. Moreover, unlike other cases in which drug and alcohol issues have been held to persist, Father fully admits that he has an alcohol issue, has taken steps to treat his addiction, and continues to actively work on his

sobriety. *See **In re Mya E.**,* 2013 WL 2106839, at \*8 (holding that conditions persisted where the father returned to drug use after completing rehabilitation and refused to admit that he had a drug problem). Instead, this case more closely resembles ***In re Joshua S.***, E2010-01331-COA-R3-PT, 2011 WL 2464720 (Tenn. Ct. App. June 16, 2011), in which this Court held that the trial court erred in focusing on the fact that the parents had not "cured" their drug addiction issues, despite evidence that the parents had completed drug treatment and the fact that the petitioners presented no proof that the parents continued to abuse drugs. *Id.* at \*12. In that case, we recognized that "[p]arents who suffer from addiction 'can turn their lives around,' but must be given the time and opportunity to do so." *Id.* (quoting ***In re: D.J.R.***, No. M2005-02933-COA-R3-JV, 2007 WL 273576, at \*5–6 (Tenn. Ct. App. Jan.30, 2007)). Although we cannot say with certainty that Father's improvements will be lasting, Petitioners here simply did not meet their burden to show clear and convincing standard that the conditions that led to the child's removal persist so as make the return of the child unsafe. The trial court's determination regarding this ground is therefore reversed.

## Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. ***In re Audrey S.***, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." ***Moody***, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

19

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Here, the trial court made detailed factual findings to support its conclusion that termination was in the child's best interest. We likewise conclude that consideration of the above factors establishes that termination of Father's parental rights is in the child's

best interest. Because Petitioners failed to present sufficient evidence to rebut Father's proof concerning his current living situation and failed to offer any proof that Father continues to abuse drugs or engage in criminal activity, we cannot conclude that Petitioners have shown that Father has failed to make a lasting adjustment of circumstances so as to make it safe for the child to return to Father's care. *See* Tenn. Code Ann. § 36-1-113(i)(1, 2). Petitioners likewise failed to establish that Father's environment is in any way unsafe for the child, either through criminal activity or continued drug and alcohol abuse. *See* Tenn. Code Ann. § 36-1-113(i)(7).

The evidence does show, however, that Father has willfully failed to maintain visitation with the child and willfully failed to provide support for the child until he was ordered to do so following the filing of the termination petition. *See* Tenn. Code Ann. § 36-1-113(i)(3, 9). In addition, there can be no dispute that Father was physically violent toward Mother in the past and that the child was present during some domestic disputes. *See* Tenn. Code Ann. § 36-1-113(i)(6). Most importantly, the record establishes that the child has been removed from Father's care for the majority of her life and, at the time of trial, had no contact with Father in over a year. According to both Legal Guardians and Prospective Adoptive Parents, the child is thriving in her current environment and would be harmed by a change in caretakers after the long absence of Father from her life. *See* Tenn. Code Ann. § 36-1-113(i)(4, 5). In a similar circumstance, this Court has held that the lack of evidence that the parent was continuing to abuse drugs or alcohol was outweighed by the evidence that the child lacked a meaningful relationship with the parent and that changing caretakers would have a detrimental effect on the child. *See **In re Joshua S.***, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011). Given Father's long absence from this young child's life and the child's progress in the care of her guardians, we simply cannot conclude that it would be in her best interest to maintain a relationship with Father. The trial court's determination that termination is in the child's best interest is therefore affirmed.

## Conclusion

The judgment of the Henderson County Chancery Court is affirmed in part and reversed in part. The termination of Appellant Steven A.'s parental rights is affirmed. Costs of this appeal are taxed to Appellant, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

21